(7 App. Div. 515)
## LORTZ v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Fourth Department.    June 17, 1896.)

RAILROAD COMPANIES—ACCIDENT AT CROSSING—EVIDENCE.

Plaintiff's intestate was killed by a passing train while he was attempting to cross defendant's track. There was evidence that the accident occurred between daylight and dark, and that smoke from an engine which previously passed obscured the view of the track. Several witnesses testified that no signal on approaching the crossing was given by the train that struck intestate. There was also evidence that intestate was obliged to hold a paper within four or five inches of his eyes in order to read; that, in attempting to work in his garden, he would pull up vegetables instead of weeds; and that he had to get very close to his nearest acquaintances to recognize them. *Held*, that it was a question for the jury whether intestate was able to distinguish the smoke from the mist and overhanging clouds.

Appeal from circuit court, Genesee county.

Action by Mary Lortz, as administratrix of Frederick Lortz, deceased, against the New York Central & Hudson River Railroad Company, to recover damages for the alleged negligence of defendant, causing the death of plaintiff's intestate. From an order denying a motion for a new trial made on the minutes after a verdict in favor of plaintiff for $1,800, defendant appeals. Affirmed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, and WARD, JJ.

Albert H. Harris, for appellant.
William C. Watson, for respondent.

WARD, J. Frederick Lortz, the deceased, who was 62 years of age at the time of his death, lived on the east side of Cedar street, in the village of Batavia, just north of the defendant's tracks. For a year previous to his death he had worked for the Wood-Working Company, whose establishment was on Cedar street, south of the tracks, and he passed over the tracks daily in going and returning from his work. Cedar street is in the outskirts of the village of Batavia. There were four railroad tracks at the intersection of Cedar street,—Nos. 1, 2, 3, and 4. The south railroad track was No. 1. No. 1 was for east-bound passenger trains; No. 2, for west-bound passenger trains; and the other two tracks were used for freight trains. Between 6 and 7 o'clock in the evening of April 16, 1889, the deceased was walking to his home from the shops where he was employed, along the side of Cedar street, which street is nearly at right angles with the defendant's tracks; and when it is light, and there is no obstruction to the vision, the track east and west of the crossing can be seen for a quarter of a mile. As the deceased approached from the south to within a few steps of track No. 1, an express train, consisting of a locomotive and six or eight cars, passed, going west on track No. 2. The deceased stopped and stood until these trains had passed. Then, looking east and west, he proceeded upon his journey, when an express train from the west, going from 35 to 40 miles an hour, passing along track 1, struck the deceased and killed him. The plaintiff

gave evidence tending to show that when the deceased approached track 1 it was between daylight and dark; that there were dark clouds in the sky, and it was somewhat misty; the west-bound train had thrown a heavy cloud of black smoke upon the track, within a few feet of the ground, and the wind prevailing blew the smoke in the direction where the deceased stood, and seemed to be near him. The train that struck the deceased passed very soon after the west-bound train. Several witnesses who were observing whether any signal or warning was given of the approach of the train that struck the deceased testified positively that no bell was rung or whistle blown, or other signal given of the approach of the train that killed the deceased. Several witnesses testified as to the condition of the deceased's eyes, and his ability to see, and it appeared from their testimony, or that of some of them, that the deceased was nearsighted; that his eyes had been affected for a long time; that they were inflamed, water ran from them, and a white film gathered over them; that, in order to see, he had to hold objects within four or five inches of his face, to distinguish such objects as the face of a clock, or to read; that, in attempting to work in his garden, he would hoe up and pull out vegetables, instead of the weeds that he was intending to remove; that, in driving nails with a hammer, he would put on his spectacles, and place his eyes very near the nails while driving them; that in assorting beans, potatoes, and other articles, he would feel around with his hands for them, to find what was plainly discernible to others; that he had difficulty, in driving upon highways, in distinguishing people and vehicles that he was passing, and he had to get very close to his nearest acquaintances to recognize them; and other circumstances were detailed pointing to a very serious difficulty in the eyes of the deceased, and great impairment of his vision.

The appellant contends that this order should be reversed on its exceptions taken at the trial upon its motion for a nonsuit, the grounds of which were that the plaintiff had not established the negligence of the defendant, nor that the deceased had been shown to be free from contributory negligence, and that the deceased was guilty of such negligence as would bar recovery in the action. There was abundant evidence to go to the jury upon the question of the defendant's negligence, and with this statement we dismiss that branch of the case.

The point mainly pressed by the appellant upon this review is that the deceased was shown guilty of contributory negligence, by the evidence, as a matter of law. In Beisiegel v. Railroad Co., 34 N. Y. 632, the court says:

"The omission of the customary signals was an assurance by the company to the plaintiff that no engine was approaching within a quarter of a mile of either side of the crossing. On this he was entitled to rely, and to the defendant he owed no duty of further inquiry."

It is true that this was said while the statute was in force requiring the blowing of a whistle or the ringing of a bell a quarter of a mile of the crossing, but since the repeal of that statute it has been distinctly settled by a long line of authorities, and it is the

law of this state, that the railroad companies at crossings should give some adequate notice or warning to travelers upon highways of the approach of their trains, and it was for the jury to determine whether, under the circumstances of each case, such warning had been given; and the deceased was therefore justified in assuming that a proper warning of the approach of any other train to that crossing would be given, and to rely upon it. The train that struck the deceased was 10 or 15 minutes late. The jury have found that no warning was given. Hearing none, the deceased, though he listened, might not hear the roar of the approaching train, as the noise of the west-bound passenger train may well have obscured the sound of the approach of the train from the west, so that the deceased, if he had heard the train while looking and waiting, may well have supposed that it was the train that had just passed, as the noise from that train, and also of the train that was approaching him, would come from the same direction. This is an important circumstance in considering whether the deceased was guilty of contributory negligence. Ingersoll v. Railroad Co., 6 Thomp. & C. 419, and cases cited; Powell v. Railroad Co., 22 Hun, 59; Leonard v. Railroad Co., 42 N. Y. Super. Ct. 225. In Greany v. Railroad Co., 101 N. Y. 425, 5 N. E. 425, Danforth, J., quotes with approval Shaw v. Jewett, 86 N. Y. 616, in which it is said:

"The plaintiff is not bound to see. He is bound to make all reasonable efforts to see that a prudent man would make in like circumstances. He is not bound to provide against any certain results. He is to make an effort for a result that will give safety,—such effort as caution, care, and prudence will dictate."

In Oldenburg v. Railroad Co., 124 N. Y. 419, 26 N. E. 1021, Judge Vann says:

"Can the court say that, knowing nothing of his surroundings, he was bound to look in any particular direction while, hearing no bell and conscious of no danger, he took one step and part of another. * * * It was his duty to look to the east, where there was no obstruction in sight; but, while he was bound to use his eyes, we cannot say that he was bound to use them in any particular manner, or at any particular instant of time. We think it was for the jury to take into consideration all the circumstances, and decide whether he exercised such care as could reasonably be required of one in his situation and knowledge."

McNamara v. Railroad Co., 136 N. Y. 650, 653, 32 N. E. 765, was a case where the plaintiff's intestate was killed at a crossing under circumstances somewhat similar to those in the case at bar, and where a preceding train had emitted a volume of smoke from its engine, which settled down upon the crossing at which the deceased was waiting for the train to pass, and prevented her from seeing objects approaching from the east or west. The court attached importance to this circumstance, upon the question of contributory negligence, and reversed the general term of the Fifth department (19 N. Y. Supp. 497), which held that, when one goes upon a railroad crossing while the smoke left by a passing train still obscures her vision so that she cannot see an approaching engine, she was guilty of negligence per se. The court of appeals held that this was a question for the jury, and, in the course of

its opinion, distinguishes the case of Heaney v. Railroad Co., 112 N. Y. 122, 19 N. E. 422, and we quote:

"In that case there was no evidence whatever of any negligence on the part of the defendant, and the decision might well rest upon that ground alone. * * * In the former case an old man, sixty-six years of age, with defective hearing, attempted to cross a railroad at a private crossing, where there was no obligation to ring a bell or sound a whistle; where no flagman was stationed; where trains might properly run at any rate of speed. It is obvious that he had no safeguards to rely upon, except such as were furnished by his senses, which were imperfect even for a person of his age and condition. The day was dark, and his vision was obscured by smoke which had settled upon the track. * * * She [the deceased in the Mc-Namara Case] had the right to rely upon the presence of a flagman to warn her of any danger. She had the right to assume that the trains would not be operated at such a place with such an unusual rate of speed, and that proper signals would be given to persons using the street, of the approach of a train, by ringing the bell and sounding the whistle. It is obvious that the conduct of the deceased in attempting to cross under such circumstances must be judged by a different rule than was applied to an aged person crossing at a private way, without any assurance of safety except his ability to hear and to see, which it appears was much impaired."

The general term, in the McNamara Case, relied upon the Heaney Case to sustain its position (and as we have seen upon appeal), without fully distinguishing between that case and the case before it. In the case at bar there had been a recovery on a former trial, and the general term of the Fifth department (83 Hun, 271, 31 N. Y. Supp. 1033) reversed the judgment, and held, upon the strength of the Heaney Case, substantially as was held in the McNamara Case at general term. Judge Lewis says, however, in deciding this case at general term (83 Hun, 271, 31 N. Y. Supp. 1033):

"There was some evidence which it is claimed by the plaintiff tended to show that the deceased's eyesight was somewhat defective. This evidence was given by the plaintiff. She testified that her husband's eyesight was defective, and that he could not see anybody very far off; that he could not see very good, far off. When asked to give her reasons for the opinion that he could not see at a distance, she replied that he told her he could not see. When asked to state any circumstance that led her to think he could not see at a distance, she replied that they were once standing in the street, and she pointed out to him some houses which she could see, and that he could not see so far or as plainly as she could; and she testified that was the only circumstance that she could remember from which she inferred that he could not see as far as she could. She testified that he caught cold in his eyes, and that water ran out of them. But, when asked to state how far distant the houses were that the deceased attempted to see, she replied that she did not know. She testified that the deceased was obliged to use eyeglasses to see to read."

The court adds:

"The deceased was sixty-two years old at the time of his death. Whether his eyesight proved to be more defective than was usual with persons of that age is doubtful. It is a matter of common knowledge that there is a difference in ability of persons to see at a distance. It cannot be fairly claimed from the evidence that there was such a defect in the decedent's eyesight as prevented him from seeing the smoke which was upon the track. There is nothing in the evidence which will justify the inference that the defect in the decedent's eyesight had anything to do with the accident. If there was a cloud of smoke upon the track, as described by the plaintiff's witnesses,—and we assume there was,—the deceased was able to see it, had he looked in that direction."

And the learned justice concludes, in effect, that the deceased was guilty of contributory negligence in going upon the track, knowing that the smoke that was there might prevent him from seeing the approaching train. We quote fully from this opinion, that we may be possessed of the evidence given upon the first trial as to the condition of the deceased's eyesight. This evidence was substantially the conclusion of the witness, and she failed to point out facts to establish her claim that the deceased was unable to see the smoke upon the track, or distinguish it from clouds or the coming darkness. Upon the second trial, as we have shown, there was abundant evidence given of facts showing that the deceased could see but a very short distance; and the assumption, therefore, that he did see the smoke, and knew it to be such, upon which the reversal of the first judgment is based, disappears, or at least it becomes a question for the jury to determine; and the question was properly submitted to the jury, upon the evidence in the last trial, as to whether the deceased was able to see the smoke, and distin.guish it as such, at the time he attempted to cross the track, or was his eyesight so defective that in the darkness gathering about him in the mist, and under the overhanging clouds, he could not distinguish the smoke from other objects. The jury found, in effect, that he could not, and with that finding we must abide. No case has ever gone so far as to hold that the person passing along a highway is bound to see an obstruction that, from physical defects and impaired vision, he cannot see. But, on the contrary, it has been held that impaired vision, and even blindness, do not prohibit a person from traveling upon a highway or a sidewalk in the day or in the night time, but he must exercise reasonable care under the circumstances of the case, and in view of his infirmities. Davenport v. Ruckman, 37 N. Y. 568, 573; Peach v. City of Utica, 10 Hun, 477; Harris v. Uebelhoer, 75 N. Y. 169, 175. The court of appeals, at the last page cited in the last case, says:

"A public highway is liable to use, and may be of right used, in the darkest night,—a night so dark that the keenest and clearest vision would not be able to detect obstacles and defects. In such a case a man traveling upon it is practically a blind man. Yet if he be injured by an obstacle or defect, with-· out the absence of what, in the circumstances, are ordinary prudence and care upon his part, he is not remediless. The fact that, having eyes, he could not see the cause of the injury, is not, per se, such conclusive evidence of his negligence as the law must so adjudge as a matter of law. Blindness, of itself, is not negligence, any more than the obscurity of sight by the absence of light."

The deceased had the right to be traveling upon this highway under the circumstances, even with his infirmities as to sight. He had the right to cross the defendant's tracks, using such care as his situation required. He had the right to demand of the defendant a proper warning of the approaching train, and to rely upon it. At best, he was surrounded by difficulties, in attempting to reach his home between daylight and dark, when the defendant was moving its trains negligently in different directions at this crossing, so he could not determine from his hearing, which appears to have been good, the approach of the train that took ⹂is life, with his impaired

vision. It was fairly a question for the jury to determine, under all the circumstances, whether the deceased was guilty of contributory negligence, and the trial court reached the right conclusion.

The case, as presented by the proof upon the last trial, is easily distinguishable from the case reviewed by the general term. It is evident from Judge Lewis' opinion that, had the same proof been given upon the first trial as upon the last, of the defect in the deceased's vision, his conclusions upon the case might have been different. The principle has been asserted so long and so often, as almost to become a legal axiom, that where the evidence, or the inferences therefrom, tends in any degree to show the freedom of the plaintiff, or the deceased that he represents, from contributory negligence, then the question of contributory negligence is not one to be disposed of by the court, but it must go to the jury.

These conclusions lead to the result that the order appealed from should be affirmed. All concur.